Ramona ALVAREZ, et al., Appellants,

v.

ANESTHESIOLOGY ASSOCIATES, et al., Appellees.

No. 13–96–385–CV.

Court of Appeals of Texas, Corpus Christi.

March 26, 1998.

Rehearing Overruled May 28, 1998.

---

Craig S. Smith, Donald B. Edwards, Smith & Edwards, Corpus Christi, for Appellants.

Linda C. Breck, Thomas F. Nye, Brin & Brin, Carlos Villarreal, Hunt, Hermansen, McKibben & Barger, Corpus Christi, for Appellees.

Before DORSEY, YANEZ and RODRIGUEZ, JJ.

## OPINION

RODRIGUEZ, Justice.

This is an appeal from a summary judgment granted in favor of appellees Anesthesiology Associates and Mary Dale Peterson, M.D. (collectively referred to herein as "Peterson"); Edgar Cortes, M.D. ("Cortes"); Tom McNeil, M.D. ("McNeil"); and William Dirksen, M.D. ("Dirksen") for claims of malicious prosecution, intentional infliction of

emotional distress, civil conspiracy, and negligence resulting from appellees' medical treatment of Michael Harwood. We affirm in part and reverse and remand in part.

## Standard of Review

The standards of review for a summary judgment are well-established. The movant must show there is no genuine issue concerning a material fact which would entitle the movant to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995). A defendant who conclusively negates at least one essential element of a plaintiff's claim or who conclusively establishes all the elements of an affirmative defense is entitled to summary judgment. *Wornick Co. v. Casas*, 856 S.W.2d 732, 733 (Tex.1993). However, in reviewing a summary judgment, all evidence is to be construed in favor of the nonmovant, to whom every reasonable inference is allowed and on whose behalf all doubts are resolved. *El Chico v. Poole*, 732 S.W.2d 306 (Tex.1987); *Nixon v. Mr. Property Mgt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985); *Dickson v. State Farm Lloyds*, 944 S.W.2d 666, 667 (Tex.App.—Corpus Christi 1997, no writ). It is not the purpose of summary judgment to deprive a litigant of his right to a full hearing on the merits of any real issue of fact, but to eliminate patently unmeritorious claims and untenable defenses. *City of Garland v. Booth*, 895 S.W.2d 766, 768 (Tex.App.—Dallas 1995, writ denied).

## Facts

Viewing the evidence in the light most favorable to appellants shows that Michael Harwood was the infant son of Roxanne Alvarez and Clifford Harwood. Since his birth, the baby was regularly treated at Driscoll Children's Hospital ("Driscoll") for asthma, pneumonia, and gastrointestinal or gastroesophageal reflux. He had a history of sleep apnea—periods when he would stop breathing while sleeping. On several occasions in late 1992 and early 1993, Alvarez brought Michael to see Dr. Steve Oshman concerning his various medical problems. Michael was prescribed a heart monitor for the apnea and the drug Reglan to control the reflux.

On January 27, 1993, Alvarez found Michael turning blue, and she rushed him to Driscoll for treatment. On the 28th, Michael again turned blue and Alvarez ran to the nurses' station screaming for help. A nurse found Michael to be cyanotic and unresponsive. He was revived and ultimately discharged on February 3, 1993.

Michael had an asthma attack on April 10, 1993, and again Alvarez took him to Driscoll, where McNeil treated him. He was then transferred out of the emergency room and placed under the care of Dirksen. He was not prescribed a heart monitor, and his Reglan was discontinued. On April 12th, at approximately 3:30 a.m., Michael was found not breathing by Norma Gonzalez, the respiratory therapist. She turned Michael onto his back and applied CPR. The resuscitation effort restored Michael's breathing, but he did not regain consciousness.[1] Michael was transferred to pediatric ICU and placed under the care of Peterson and Cortes.

After Michael was in ICU for approximately thirty-six hours, red marks appeared on the back of his neck and head. Cortes called Children's Protective Services ("CPS") to report suspected child abuse. The risk management department at Driscoll was also notified.

On April 15th, Alvarez and Harwood were informed of Michael's vegetative condition. Harwood demanded to know the reason for CPS involvement and suggested the doctors and the hospital had engaged in a cover-up of their negligence. Also on April 15th, the police were summoned to Driscoll. Alvarez was interviewed and Michael was photographed.

In addition to initially reporting to CPS, Cortes wrote to CPS on April 24, 1993, and stated Alvarez had not informed the hospital of Michael's previous medical history; that the apnea attacks occurred only in Alvarez's presence; and that Alvarez seemed more concerned with getting Harwood out of prison than in Michael's health.

---

1. Michael remained in a coma and died after several months.

On April 29th Peterson gave a statement to CPS concurring with Cortes. She also concluded the bruises found on Michael's neck could not be caused by resuscitation efforts, but only by being held face down. Cortes contacted CPS for a third time on May 6, 1993 and opined that Alvarez deliberately attempted to suffocate Michael by forcing his head into the mattress.

Alvarez was ultimately indicted, but on April 14, 1994, the indictment was dismissed. Alvarez and her parents filed suit against appellees[2] asserting claims for malicious prosecution, intentional infliction of emotional distress, civil conspiracy, and negligence. The appellees filed motions for summary judgment, which the court granted.

## Analysis

Because appellants alleged the same four causes of action against each of the appellees, for ease of reference we will first set out the elements of each cause of action and then address the merits of each appellee's motion for summary judgment in the context of these elements.

### I. Malicious Prosecution

■ In order to maintain a malicious prosecution action, a plaintiff must prove: 1) the commencement of a criminal prosecution against the plaintiff; 2) initiated or procured by the defendant; 3) which terminated in the plaintiff's favor; 4) the plaintiff was innocent; 5) there was no probable cause for the proceedings; 6) malice; and 7) damages. *Browning–Ferris Indus., Inc. v. Zavaleta*, 827 S.W.2d 336, 338 (Tex.App.—Corpus Christi 1991, writ denied).

In*Browning–Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288 (Tex.1994), the supreme court modified the causation element of a malicious prosecution case. The court expressly rejected the concept that the prosecution could be brought about merely through a defendant's aid or cooperation. Instead, the court held that malicious prosecution occurs only when a defendant "initiates" or "procures" the prosecution. *Lieck*, 881 S.W.2d at 293. "Initiation" occurs when a defendant is the entity that actually files the charges. The court defined "procurement" as follows:

> A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, *unless the person provides information which he knows is false.*

*Lieck*, 881 S.W.2d at 293 (emphasis added).

Appellants alleged appellees knew that any injury to Michael was the result of their own negligence in failing to adequately treat him. Appellants contended appellees engaged in a cover-up of the doctors' and the hospital's liability by accusing Alvarez of injuring her own child; that Alvarez's prosecution was procured and propelled in bad faith or maliciously in an effort to deflect attention from the negligent medical care given to Michael.

All appellees claimed immunity from malicious prosecution under the mandatory child abuse reporting provisions of the Texas Family Code. At the time of the incidents in question, the family code provided:

> A person having cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect by any person shall report in accordance with Section 34.02 of this code.

TEX. FAM.CODE ANN. § 34.01 (Vernon 1989) (Act of June 16, 1989, 71st Leg., R.S., ch. 1265, § 2, 1989 Tex. Gen. Laws 5849 (repealed 1995)) (current version at TEX. FAM. CODE ANN. § 261.101(a) (Vernon 1996)). The code further provided:

> (a) Except as provided by Subsection (b) of this section, a person reporting or assisting in the investigation of a report pursuant to this chapter is immune from liability, civil or criminal,

---

**2.** She also sued Driscoll Foundation Children's Hospital; Driscoll Children's Hospital; The Children's Clinic; Steve Oshman, M.D.; Odent Yous- sef, M.D.; and Norma Gonzales, R.T. They are not before the Court in this appeal.

that might otherwise be incurred or imposed. Immunity extends to participation in any judicial proceedings resulting from the report.

(b) Persons who report their own conduct or who otherwise report in bad faith or malice, or assist in the investigation of a report in bad faith or malice, are not protected by this section.

TEX. FAM.CODE ANN. § 34.03 (Vernon 1989) (Act of June 14, 1989, 71st Leg., R.S., ch. 371, § 8, 1989 Tex. Gen. Laws 1466 (repealed 1995)) (current version at TEX. FAM.CODE ANN. § 261.106(a), (c) (Vernon 1996)).

■ Appellants counter with the argument that if a jury determines any of the doctors were negligent and sought to cover up their negligence through the prosecution of Alvarez, they will have shown the requisite bad faith or malice that exempts the doctors from immunity. Bad faith and malice are elements that are not properly disposed of by summary judgment because they entail the evaluation of intent. *Villacana v. Campbell,* 929 S.W.2d 69, 73 (Tex.App.—Corpus Christi 1996, writ denied); *Wofford v. Blomquist,* 865 S.W.2d 612, 614 (Tex.App.—Corpus Christi 1993, writ denied).

### A. McNeil and Dirksen

■ In their motions for summary judgment, McNeil and Dirksen attached their affidavits, each stating

I deny that I had any conversations whatsoever with anyone from Child Protective Services or any other department or investigating agency for which the Plaintiffs' claims seem to be based. I had no contact with them whatsoever in any manner with respect to the case of Michael Harwood.... I simply did not in any way whatsoever, speak with, write, talk to, or otherwise communicate with Child Protective Services or any other investigation agency in this matter.

Appellants did not refute these affidavits by providing any competent summary judgment evidence that McNeil and Dirksen were involved in any way with the reporting of the incident to CPS or with CPS's subsequent investigation.

McNeil's and Dirksen's affidavits established as a matter of law that they neither initiated nor procured the criminal prosecution of Alvarez. Having negated one element of appellants' cause of action, the trial court did not err in granting summary judgment on this cause of action. Points of error three and four are overruled.

### B. Peterson

■ To prevail on a defense to malicious prosecution, a defendant must show that probable cause justified the initiation of criminal proceedings. *Ellis County State Bank v. Keever,* 888 S.W.2d 790, 793–94 (Tex.1994) (opinion on reh'g); *Akin v. Dahl,* 661 S.W.2d 917, 920 (Tex.1983), *cert. denied,* 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984); *Zavaleta,* 827 S.W.2d at 338. In the context of malicious prosecution, probable cause is "the existence of such facts and circumstances as would excite belief in the mind of a reasonable person, acting on facts within his knowledge, that the person charged was guilty of the crime for which he was prosecuted." *Richey v. Brookshire Grocery Co.,* 952 S.W.2d 515, 517 (Tex.1997) (citing *Akin,* 661 S.W.2d at 921); *Metzger v. Sebek,* 892 S.W.2d 20, 42 (Tex.App.—Houston [1st Dist.] 1994, writ denied) (quoting *Compton v. Calabria,* 811 S.W.2d 945, 949 (Tex.App.—Dallas 1991, no writ)). The question to be answered is not what the facts actually were, but rather what the defendant honestly and reasonably believed the facts to be. *Metzger,* 892 S.W.2d at 42; *Compton,* 811 S.W.2d at 950.

Peterson delineated her probable cause as follows:

1. Pulmonary arrest was suspicious because Michael's lungs were "working well."

2. Upon review of the medical records, she observed the apnea attacks occurred only in Alvarez's presence, and she appeared to be sleeping, although monitors were going off during one incident.

3. Alvarez persistently fed Michael by propping up his bottle while Michael was laying down, a practice she had been instructed not to do.

4. A review of the medical records indicated neither the admitting physician, resident,

or nurse were informed by Alvarez that Michael had been hospitalized previously for apnea or gastro-esophegeal reflux, that he was on medication to control the reflux, and that he had been on an apnea monitor.

5. When Peterson interviewed Alvarez, she (Alvarez) contradicted herself regarding whether she had informed admitting personnel about Michael's medical history; and

6. She noticed red marks on the back of the child's neck that looked like fingerprints, which she did not believe to have been caused by resuscitation efforts.

 There is an initial presumption in malicious prosecution cases that the defendant acted in good faith and had probable cause to initiate or procure the prosecution. *Richey,* 952 S.W.2d at 517. That presumption disappears once a plaintiff produces evidence that the motives, grounds, beliefs, and other evidence upon which the defendant acted did not constitute probable cause. *Id.* at 518.

Appellants' response questioned whether Peterson had probable cause and whether she reasonably believed Alvarez had attempted to suffocate Michael. Their summary judgment proof included the following:

1. Michael's hospital records from the admission in question, as well as his previous admissions. These records showed Michael was born with "Mongolian spots"; he had been admitted to Driscoll for asthma and bronchitis; his condition required a breathing monitor; and he was on medication to control gastroesophageal reflux, a condition which can cause vomiting and aspiration of the vomitus.

2. Alvarez's deposition, in which she states:

 (a) at least one of Michael's apneic attacks occurred in January 1993 when Michael was in his room directly across from the nurses' station.

 (b) other than on one occasion in which she propped up Michael's bottle, and after she was instructed not to do so, Alvarez did not feed Michael by the bottle propping method; she always

held him upright because of his reflux problem.

 (c) she did not withhold information from the doctors and/or hospital staff. To the contrary, in her deposition, Alvarez related an incident with the nursing staff in which she insisted Michael have a breathing monitor, that he had had one during his previous admissions and that the nurses refused to give Michael a monitor because he did not need one and no doctor had prescribed it.

3. Police photographs, taken on April 15, 1993, which did not indicate the presence of any bruises on Michael's head or neck.

4. The deposition of Dr. Joseph Anzaldua, plaintiff's expert, in which he testified he could not tell from looking at the blurry Polaroid pictures taken by the hospital staff on April 13, 1993, whether there were any bruises on Michael. He specifically declined to say the marks were bruises.

5. The deposition of Dr. Steve Oshman, Michael's treating physician, in which he described one of the steps in administering CPR to an infant as placing the thumbs behind the back of the baby's head to tilt the head backwards and clear the airway.

Alvarez did not produce any evidence which suggested Peterson knew the information provided to CPS was false. While Alvarez's summary judgment evidence creates a fact question with respect to whether she caused Michael's injuries, it does not controvert Peterson's evidence that she acted in good faith. Peterson simply offered her opinion, based on facts as provided to her by the other doctors and the medical records. Unlike the other doctors, who are business associates, Peterson was not alleged to have committed any act of malpractice, not having seen Michael until he was already comatose and on a ventilator.

The critical facts relied on by Peterson were not disputed. She was faced with an infant who had suddenly lapsed into a life-threatening coma and concluded the child's lungs appeared healthy and would not explain respiratory failure. She was told by other doctors that, in their opinion, the cir-

cumstances of the child's infirmity were suspicious. She was apprised that Cortes had indeed contacted CPS, based on his apparent suspicions. She observed the medical records which, as described above, suggested Alvarez was not forthcoming with information, had disregarded prior medical advice concerning her child's well-being, and was the only person present when the child suffered his attacks. Based on the records relied upon by Peterson, as well as her conferring with other doctors, together with Alvarez's inability to refute the veracity of Peterson's statements (*i.e.* that these items were in records which she relied on to form her conclusions), we find Alvarez failed to rebut the presumption that Peterson had probable cause to suspect abuse.

Peterson's discussions with the other doctors, review of the medical records, and her cooperation with CPS investigation were apparently based on nothing more than sound medical practice. Indeed, the Texas Family Code compels doctors having cause to believe that a child's physical and mental health or welfare has been adversely affected by abuse or neglect to orally report their suspicions within forty-eight hours.

■ There are important policy considerations which favor affirming the summary judgment with respect to Peterson as well. It has often been stated generally that "actions for malicious prosecution are not favored in the law." *Lieck*, 881 S.W.2d at 291 and cases cited therein. This cause of action involves "a delicate balance between society's interest in the efficient enforcement of the criminal law and the individual's interest in freedom from unjustifiable and oppressive criminal prosecution." *Richey*, 952 S.W.2d at 517. Doctors and other health care professionals have an affirmative duty to report suspected abuse. The law does not require them to be certain abuse has occurred before they report, but merely "to have cause to believe." [3] Given the language in the statute and the burden imposed by it, we believe physicians should be afforded deference in reporting such matters. The life threatening injury was sustained by Michael before Pe-

terson treated him. She set out an objectively reasonable basis for her belief Alvarez had abused Michael, and therefore, the immunity afforded by the family code is extended to her.

Point of error one is overruled. Based on this same analysis, we also overrule point of error five (the trial court erred in granting Peterson's motion for summary judgment on Alvarez's claim of intentional infliction of emotional distress), and point of error nine (the trial court erred in granting Peterson's motion for summary judgment on Alvarez's claim of conspiracy).

### C. Cortes

■ Cortes delineated his probable cause to notify CPS as follows:

Following Michael's cardio-respiratory arrest, it was noted by myself and other treating physicians, that the recurrent episodes of respiratory arrest and near arrest occurred only in the presence of the mother and never when another person was present. This, coupled with the fact that shortly after this final episode, Michael developed some suspicious bruising on the back of his head and neck, lead the health care providers to suspect that there may have been or may be in the future some intentional harm to Michael by the mother....

In their response, appellants questioned whether Cortes "honestly and reasonably, or actually, believe[d] that Michael Harwood had suffered a failed suffocation attempt by his mother." They provided the following summary judgment evidence:

1. Michael's medical records. In addition to describing his previous admissions and treatments, the records stated Michael suffered a cardio/pulmonary arrest that was the "possible result of regurgitation and aspirating."

2. Peterson's deposition in which she admitted (1) Michael's condition, including the apnea, aspiration and reflux problems could have caused his respiratory arrest; and (2) she is not a forensic pathologist

---

**3.** The code indicates the report "should reflect the reporter's belief that a child has been or may be abused or neglected." TEX. FAM.CODE ANN. § 261.102 (Vernon 1996).

and is not qualified to determine the cause of Michael's cardio/pulmonary arrest, nor is she qualified to assess the cause of any red marks or bruises that may have been visible on Michael's body. Peterson said she would not have notified CPS.

3. The records from the CPS investigation. Ms. Bonneau noted she had called Cortes on April 13, 1993 at approximately 2:30 to question him about the incident. "I asked Dr. Cortes, 'Can you tell me about the monitor the child had in the past?' Dr. Cortes did not respond to the question," but instead continued to assert Alvarez had pushed Michael's face into the mattress.

4. Dr. Joseph Anzaldua's deposition in which he stated, "it just seems to me that everything starts coming into play after the lawsuit or after all these incidents and all of a sudden these physicians kind of decide, through whatever inspiration they have, that this mother is a bad mother doing all these bad things to this poor child. It just doesn't fit. And the medical records, as I stated before, do not substantiate any of their theories or scenarios or possibilities that they seem to be postulating, as we say, in the records that I've reviewed."

When asked whether the red marks observed on Michael were bruises as alleged by the doctors, Anzaldua stated, "Specifically in this case of everything I know about this case, I would not feel comfortable agreeing to that. I mean, the very people that are making those allegations are the people that are named in this lawsuit are turning right around and accusing the mother of injury to the child. I really in good conscience cannot agree to that. In this particular case, I couldn't do it."

5. Dr. Oshman's deposition testimony outlining the procedure for infant CPR.

6. Police photographs, taken on April 15, 1993, that do not indicate the presence of any bruises on Michael's head or neck.

We conclude appellants' summary judgment evidence created fact questions with respect to not only the origin and cause of any marks on Michael's head, but more importantly, whether Cortes reasonably believed Alvarez had injured Michael.

Appellants' theory of the case must be kept in mind—that the entire story of Alvarez's abuse was fabricated by appellees, acting in concert, as a cover-up for their medical negligence. In light of this unique framework, we disagree with appellees' prophecy that our holding will have a chilling effect on the mandatory reporting of suspected child abuse or neglect. Our opinion is limited to the facts of this case, that being those situations where the plaintiff claims the defendant fabricated the existence of abuse or neglect or fabricated the existence of probable cause to cover up his own negligent conduct in causing injury to the child.

Point of error two is sustained.

## II. Intentional Infliction of Emotional Distress

A plaintiff establishes intentional infliction of emotional distress if he can show: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) defendant's conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe. *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993).

In their motions for summary judgment, both McNeil and Dirksen stated only that appellants "have no proof of three of the four requisite elements in this case." Cortes stated appellants "have no proof of two of the four requisite elements in this case." While appellants would ultimately have the burden of proof at trial to present sufficient evidence to prove each of the elements of this cause of action, they were not required to do so before that time.[4] Neither Cortes, McNeil, nor Dirksen delineated what appellants' lack of proof was, nor did they provide any evidence to negate the elements of intentional inflic-

---

4. The new "no evidence" summary judgment rule was not in effect when appellees filed their motions. *See* Order of April 16, 1997, 60 Tex

B.J. 534 (amending Tex.R. Civ. P. 166a, eff. Sept. 1, 1997).

tion of emotional distress. Their sole evidence consisted of the following:

*Affidavit of McNeil and Dirksen*

> I have been informed what the elements of a claim for Intentional Infliction of Emotional Distress ... are. I have reviewed Plaintiffs' Third Amended Original Petition with respect to their claims of Intentional Infliction of Emotional Distress.... I specifically deny each and every one of the claims in each of the aforementioned causes of action with respect to any care and treatment rendered by me in this case.

McNeil and Dirksen also denied having any conversations with anyone from CPS or with any other investigating agency.

*Affidavit of Cortes*

> I have been informed what the elements of a claim for intentional infliction of emotional distress are. With respect to Plaintiffs' claims for intentional infliction of emotional distress, I specifically deny each and every one of those claims. I deny that I acted intentionally or recklessly to cause harm to the Plaintiffs. I deny that my contact by merely exercising my duty was in anyway [sic] extreme or outrageous. I further deny that Plaintiffs were caused emotional distress or that said distress was severe as a result of any actions that were taken by me.

In *Anderson v. Snider,* the supreme court held that testimony comprised only of legal conclusions is insufficient to support summary judgment as a matter of law. 808 S.W.2d 54, 55 (Tex.1991); *see also Mercer v. Daoran Corp.,* 676 S.W.2d 580, 583 (Tex. 1984); *Hidalgo v. Surety Savings & Loan Ass'n,* 487 S.W.2d 702, 703 (Tex.1972) (per curiam). Likewise, conclusory statements made by an expert witness are insufficient to support summary judgment. *Anderson,* 808 S.W.2d at 55; *Vinklarek v. Cane,* 691 S.W.2d 108, 111 (Tex.App.—Austin 1985, writ ref'd n.r.e.). These doctors' affidavits are wholly insufficient to negate appellants' cause of action for intentional infliction of emotional distress as a matter of law; they are merely sworn denials of appellants' claims.

Appellants' sixth, seventh and eighth points of error are sustained.

### III. Conspiracy

To prove civil conspiracy, the plaintiff must show the following elements: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object to be accomplished; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Triplex Communications, Inc. d/b/a Radio Station KZZB–95 FM v. Riley,* 900 S.W.2d 716, 719 (Tex.1995); *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex.1983); *Bernstein v. Portland Sav. & Loan Ass'n.,* 850 S.W.2d 694, 706 (Tex. App.—Corpus Christi 1993, writ denied).

In their motions for summary judgment, McNeil and Dirksen provided the affidavits set out above. While the affidavits are sufficient to establish that neither McNeil nor Dirksen communicated with CPS, neither appellee stated he did not discuss the case with any of the other appellees. On this basis alone, we find this affidavit evidence insufficient as a matter of law to negate appellants' claim of conspiracy.

Moreover, appellants' summary judgment proof included excerpts from McNeil's deposition in which he stated he had several conversations with Cortes regarding Michael's bruising and Michael's "unexplained" apneic episodes. McNeil stated Michael's apnea was caused by abuse, an opinion substantiated by viewing the child in ICU and the bruises to the back of his head. McNeil conceded, however, that he did not go to look at Michael in ICU until requested to do so by Cortes. He also conceded he saw no signs of abuse when Michael was admitted in the emergency room and he made no notation in Michael's emergency room record that he suspected any abuse.

Dirksen stated in his deposition that he went to see Michael in ICU even though at that time Michael was no longer his patient, but was Cortes's patient. He observed bruising on the back of Michael's neck. He consulted with Cortes and Peterson about it. When asked if he considered whether the bruising could have occurred when Norma Gonzales attempted to resuscitate Michael after he had vomited and aspirated milk,

Dirksen stated he was not aware Michael had vomited, nor was he aware that the medical records contained notations that Michael had vomited. The following transpired:

Q: Would you like to read them [the medical records] now if you've never read them before?

A: Yes, please.

Q: Don't you think before you start speculating that a mother might have intended harm to her—

A: I, sir—

Q: —own child that you might read the medical records—

A: I—

Q: —sir?

A: I, sir, did not—I have a—I have a legal responsibility that if I think that a child has been abused that I need to report it. Dr. Cortes and I discussed it. He did in fact report it. If he hadn't, I would have.

Also attached to appellants' response to both McNeil's and Dirksen's motions were excerpts from Cortes's deposition in which he stated "it was now *the consensus of the doctors* who were caring for [Michael] that he might have been the victim of abuse." (Emphasis added). Cortes stated he was sure all the doctors discussed the case and before he called CPS, Cortes talked to McNeil and Dirksen.

Appellees included the foregoing testimony of Cortes in their response to his motion for summary judgment as well.

Appellants' summary judgment proof creates a fact question regarding elements one, two, and three set out in *Riley*and *Massey*. Points of error ten, eleven, and twelve are sustained.

### IV. Negligence

#### A. Peterson

In point of error thirteen, appellants complain the trial court erred in granting summary judgment in favor of Peterson on their claims of negligence and gross negligence. During oral argument, appellants informed the Court they were waiving this point of

error. Accordingly, it is not necessary to address it. Tex.R.App. P. 47.1.

#### B. Cortes

In point of error fourteen, appellants complain the trial court erred in granting summary judgment in favor of Cortes on their claims of negligence and gross negligence. In a medical malpractice suit, because the trier of fact must be guided by the opinion testimony of experts, *Hart v. Van Zandt*, 399 S.W.2d 791, 792 (Tex.1965), a defendant physician can obtain summary judgment based on his uncontroverted testimonial evidence if he establishes, as a matter of law, that no genuine issue of material fact exists as to one or more elements of the plaintiff's cause of action. Tex.R. Civ. P. 166a(c); *Davis v. Manning*, 847 S.W.2d 446, 449 (Tex.App.—Houston [14th Dist.] 1993, no writ).

The threshold question in a medical malpractice case is the standard of care, which must be established by expert testimony. *Hall v. Tomball Nursing Center, Inc.*, 926 S.W.2d 617, 620 (Tex.App.—Houston [14th Dist.] 1996, no writ); *Chopra v. Hawryluk*, 892 S.W.2d 229, 233 (Tex.App.—El Paso 1995, writ denied); *Armbruster v. Memorial Southwest Hosp.*, 857 S.W.2d 938, 941 (Tex. App.—Houston [1st Dist.] 1993, no writ). Testimony from an interested expert, such as the defendant doctor, can establish the standard of care and support summary judgment if the testimony is clear, direct, positive, otherwise credible, free of contradictions and inconsistencies, and capable of being readily controverted. *Hall*, 926 S.W.2d at 620; *Chopra*, 892 S.W.2d at 233. It is not sufficient for an expert to simply state he knew the standard of care and conclude it was met. Rather, the expert must state what the standard is and explain how the defendant's acts met it. *Hall*, 926 S.W.2d at 620; *Nicholson v. Naficy*, 747 S.W.2d 3, 4–5 (Tex.App.—Houston [1st Dist.] 1987, no writ).

Cortes's sole summary judgment evidence consisted of his affidavit. He stated:

I am familiar with the definition of gross negligence, that being explained to me as meaning more than momentary thoughtlessness, inadvertence, or error of judg-

ment. It means such an entire want of care as to establish that the act or omission in question was the result or actual conscious indifference to the rights, welfare, or safety of the persons affected by it. I specifically deny the allegations of gross negligence made by the Plaintiffs pertaining to me.

I am familiar with the definition of negligence per se, that being explained to me as conduct, whether of action or omission, which may be declared and treated as negligence without any argument or proof as to the particular surrounding circumstances, either because it is in violation of a statute or valid municipal ordinance, or because it is so palpably opposed to the dictates of common prudence that it can be said without hesitation or doubt that no careful person would have been guilty of it. I specifically deny the allegations of negligence per se made by the Plaintiffs pertaining to me.

I have reviewed the Plaintiffs' Third Amended Petition in this case. I deny that any act or omission on my part as specifically stated therein was in any way negligent or grossly negligent or in any way adversely affected the health and safety of Michael Harwood.

Further, it is my expert opinion, based on a reasonable degree of medical probability, that none of the damages [P]laintiff claims in Plaintiffs' latest Petition were in any way caused by any negligent act or omission on my part.

Cortes' affidavit falls far short of the requirements set out in *Hall*. Nowhere in this affidavit did Cortes delineate the standard of care, state he was familiar with the standard of care, or how his conduct complied with that standard. As in *Hall*, although Cortes's affidavit stated that no act or omission on his part caused damage to Michael, we find the statement conclusory because we do not know what actions were taken by Cortes in treating Michael. He merely stated:

> The next time I saw Michael was on April 13, 1993. He had been admitted to the hospital on April 10, 1992[sic] by my associate, Dr. Tom McNeil for treatment of

symptomatic asthma. At the time that I saw Michael, he had already experienced the cardio-pulmonary arrest made the basis of this lawsuit, and had been transferred to the Pediatric Intensive Care Unit. Michael was in a coma and remained so throughout the entire remainder of his hospital stay at Driscoll.

As appellants noted in their response to Cortes's motion, Cortes's affidavit lacked factual detail to the extent they would have had great difficulty controverting it. *Hall*, 926 S.W.2d at 620. We conclude Cortes's affidavit does not set out the applicable standard of care and does not negate appellants' claim of negligence as a matter of law.

Point of error fourteen is sustained.

By point of error fifteen, appellants complain of the trial court's failure to grant their motion for new trial. The motion was based on two factors: (1) that they had acquired new evidence—what they term the "defendants' manual of strategies for avoiding litigation" [5] and (2) a new trial should be granted in the interest of justice. Neither point has merit.

■■■ We review denials of motions for new trial based on newly discovered evidence under an abuse of discretion standard. *Jackson v. Van Winkle*, 660 S.W.2d 807, 809 (Tex.1983). In order to obtain a new trial, a plaintiff must show that (1) the evidence has come to their attention since the trial; (2) it was not discovered earlier due to the lack of diligence; (3) the evidence is not cumulative; and (4) it is so material that it would produce a different result if a new trial were granted. *Id.* at 809.

After reviewing the statement of facts from the hearing on the motion for new trial, we conclude appellants failed to establish the second and third prongs of the *Jackson* test. After hearing the argument of counsel, the trial court concluded that, although appellants did request appellees produce the manual and any incident reports, when the information was not forthcoming, appellants did not file a motion to compel. The court stated:

---

5. What was obtained was Driscoll's Risk Man- agement Policy and Procedure Manual.

Those were matters that could have been brought up pre-trial so to speak. You did have the right to compel the other side to deliver documents and answer questions and so forth .... and I think you missed your opportunity.

Moreover, appellants failed to put on any evidence that the manual would not be cumulative of other evidence already before the court via the motions for summary judgment.

Finding that the trial court did not abuse its discretion in denying the motion for new trial, we overrule point of error number fifteen.

The judgment of the trial court is AFFIRMED with respect to Peterson on all causes of action and with respect to McNeil and Dirksen on Alvarez's cause of action for malicious prosecution. The judgment is REVERSED and REMANDED on all causes of action with respect to Cortes and with respect to McNeil and Dirksen on Alvarez's causes of action for conspiracy and intentional infliction of emotional distress.