**FIRST VALLEY BANK OF LOS FRESNOS, Norwest Bank Texas, N.A., and Wells Fargo Bank (Texas), N.A., Appellants,**

v.

**Sam MARTIN, Appellee.**

**No. 13–99–769–CV.**

Court of Appeals of Texas, Corpus Christi.

Aug. 9, 2001.

---

Charles W. Rhodes, Raul A. Gonzalez, Locke, Liddell & Sapp, Austin, Tom Fleming, Fleming & Olvera, P.C., Brownsville, Attorneys for Appellants.

Ernesto Gamez, Jr., Law Offices of Ernesto Gamez, Jr., Brownsville, Larry Zinn, San Antonio, Thomas G. Sharpe, Jr., Brownsville, Attorneys for Appellee.

Before Chief Justice VALDEZ and Justices HINOJOSA and RODRIGUEZ.

## OPINION

RODRIGUEZ, Justice.

First Valley Bank of Los Fresnos, Northwest Bank of Texas, N.A., and Wells Fargo Bank (Texas), N.A., appellants, appeal from a money judgment in the amount of $18,089,095.00, in favor of Sam Martin based on a jury's findings of malicious prosecution and fraud. We reverse and render in part, modify in part, and affirm as modified.

In February of 1992, Martin borrowed approximately $20,000.00 from First Valley Bank of Los Fresnos (the bank) to help fund his campaign for sheriff of Cameron County. The bank took a security interest in cattle owned by Martin in Loma Alta, a large area of land between Brownsville and Port Isabel.

The parties dispute the number of cattle in which the bank held a security interest. A document titled, "Notice of Security Interest" describes the security interest as "75 Head of Cross–Bred Cattle." The note lists the security as "[a]ll livestock now owned or hereafter acquired by debtor including but not limited to 75 head of crossbred cattle." Martin testified that at the time he obtained the loan, he had more than 200 head of cattle.

The security agreement contained a provision prohibiting Martin from selling or transferring the collateral without obtaining the written consent of the bank. The provision also required Martin to provide a detailed notice before selling any farm products constituting a portion of the collateral in the ordinary course of business.

Martin renewed the note several times between 1992 and 1994. In September of 1994, he combined the loan with a car loan for the aggregate amount of $31,209.99. The note was secured by an automobile and "All livestock now owned and hereafter acquired by debtor, wherever located including but not limited to seventy-five (75) head of crossbred cattle." The security agreement for this loan also provided that Martin could not sell or transfer the collateral without written consent of the bank.

Martin continued to renew the note periodically. In 1995, Martin sold fifty-eight head of cattle to Dr. Lynn Anderson. Martin testified that Gus Barrera, chairman of the board with the bank, helped him with the sale of the cattle. Martin did not notify the bank before selling the cattle nor did he obtain its written consent for the sale. Martin testified he was not aware he needed to notify anyone of the sale and that Barrera was with him at the sale, knew of the loan, and never questioned him about the sale. Moreover, at the time of the sale, Martin had approximately two hundred twenty head of cattle, leaving more than enough cattle for what he believed the security interest covered, namely, seventy-five head of cattle.

In 1996, Martin left Texas to manage several cattle ranches in New Mexico, Colorado, Florida, and Utah for a corporation. Martin's son, Gus Martin, stayed in Texas to take care of the cattle operation.

The note became due on September 5, 1996, but Martin failed to pay the note or renew the note as he had previously. In October of 1996, Gus Martin met with Markus Villanueva, Martin's loan officer, at the bank and paid the accrued interest on the loan pursuant to Martin's directions. Gus Martin testified Villanueva wanted to speak with Martin. Gus Martin informed Villanueva that his father could not make it, but would be back around the first of the year to renew the note.

Villanueva told Gus Martin that he was going to accelerate the note. However, Villanueva also told him that when his father came in to renew the note, the bank would return the interest rate to the level in the note. Martin told his son that he would return during the Christmas holidays to renew the note, and had his son pay $500 in principal in December before he returned to Texas.

As the note was in default, the bank transferred the loan to its special assets department. Martin returned to Texas in December of 1996 and deposited $1,451.41 into his checking account at the bank. When he went to withdraw funds from this

account, he learned that the money had been seized and applied toward the loan. Martin testified that he met with bank officials, who told him they had foreclosed on the loan. When Martin asked them why they did not attempt to fax him paperwork to renew the note, they did not want to talk about it. Martin told the bank officials that if they did not put the money back and renegotiate the loan, they would not hear from him again.

Martin returned to his job in Colorado. There is some dispute as to whether the bank knew of Martin's location at this time. The parties agree Martin's attorney, Donald Gilpin, of Albuquerque, New Mexico, contacted the bank. Shortly thereafter, Villanueva sent Gilpin a letter outlining the terms for Martin to renew his loan. Gilpin replied, indicating, among other things, that Martin would mail the bank a payment. Martin did not, however, do so.

On May 30, 1997, the bank sold twenty of Martin's cattle to Ruben Barrera, Gus Barrera's brother, for $4,000.00. Villanueva testified he did not send Martin a letter notifying him of the sale because he could not locate him.

In June of 1997, Villanueva called Gilpin. Gilpin sent the bank a letter stating he had terminated representation of Martin and that he had been unsuccessful in contacting him since January of 1997.

Jimmy Vasquez, an investigator with the Cameron County sheriff's office testified that Villanueva called him in June or July of 1997 and told him he could not find cattle Martin had put up for collateral. Vasquez testified Villanueva asked him to make a criminal complaint, and that Villanueva told him Martin did not have the cattle. Vasquez went to the bank where he took a statement from Villanueva. Vasquez also testified that when he went to the bank, he told Villanueva there had

been some complaints of criminal trespass in the Loma Alta area.

Vasquez filed an investigative report dated July 3, 1997. According to the report, Vasquez met with Villanueva, who told him about the loan and stated that Martin had "put up 75 head of cross bred cattle as collateral to cover the loan. This loan was to be paid with the sale of the cattle or their offspring." The report stated that "[t]he bank attempted to pick up the cattle for the note that was past due and upon doing so the cattle could not be found to collect on the note." After completing his investigation, Vasquez turned his report in to the district attorney's office.

The bank gave Credit Management Services (CMS) the task of collecting the debt owed by Martin. CMS drafted a proposed agreement, which Villanueva signed. CMS contacted Gus Martin, who obtained a power of attorney to act on his father's behalf. Martin told Gus not to sign the proposed agreement, however, and no agreement was reached.

In January 1998, Martin was indicted for the offense of hindering a secured creditor. The indictment was ultimately dismissed. Thereafter, Martin brought suit against appellants, alleging they provided false and incomplete information, which was turned over to the district attorney's office, and led to Martin's indictment. After a trial on the merits, the jury found appellants maliciously prosecuted Martin and awarded $500,000 in mental anguish damages, $2,000,000 for damages to reputation, $50,000 for damages to credit reputation, and $360,000 for loss of earning capacity. The jury further found appellants committed fraud and awarded Martin $40,000 damages for loss of the benefit of the bargain. The jury also awarded Martin $15,000,000 in exemplary damages.

Appellants filed a motion for new trial, which was ostensibly overruled,[1] and filed a timely notice of appeal. Martin filed a request for the trial court to make conclusions of law. Appellants responded, arguing that the trial court was unauthorized to make conclusions of law in a jury trial. The trial court found it had authority to so act and entered conclusions of law. This appeal ensued.

By their first and third issues, appellants contend there is legally insufficient evidence to support the finding of liability for malicious prosecution.

■ We review a legal sufficiency challenge by considering all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex.1998); *Edwards v. Pena*, 38 S.W.3d 191, 196 (Tex.App.—Corpus Christi 2001, no pet.); *Alvarez v. Anesthesiology Assocs.*, 967 S.W.2d 871, 875 (Tex.App.—Corpus Christi 1998, no pet.).

■ To maintain a cause of action for malicious prosecution, a plaintiff must prove: (1) the commencement of a criminal prosecution against the plaintiff; (2) initiated or procured by the defendant; (3) which terminated in the plaintiff's favor; (4) the plaintiff was innocent; (5) there was an absence of probable cause for the proceedings; (6) the defendant acted with malice; and (7) damages. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517 (Tex.1997); *Alvarez*, 967 S.W.2d at 875.

Appellants contend there is no evidence that they initiated or procured the criminal prosecution.

■ The causation element requires the plaintiff to show the prosecution was initiated or procured by the defendant. *Browning–Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 290–93 (Tex.1994). "Initiation" of a criminal prosecution occurs when the defendant is the entity that actually files the charges. *Alvarez*, 967 S.W.2d at 875. The Texas Supreme Court has defined "procurement" as follows:

A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred.... Thus, a person cannot procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another person, a law enforcement official or the grand jury. *An exception ... occurs when a person provides information which he knows is false to another to cause a criminal prosecution.*

*Lieck*, 881 S.W.2d at 293 (emphasis added).

■ Martin concedes appellants did not initiate the prosecution. He further concedes that the decisions to prosecute and indict him were in the sole discretion of the district attorney and grand jury, respectively. Thus, evidence that appellants procured the prosecution by providing information which they knew was false will support Martin's malicious prosecution cause of action. *Id.*

■ According to Vasquez, Villanueva told him Martin had had two hundred head

**1.** There is no order overruling the motion for new trial. At the end of the hearing on the motion for new trial, the trial judge informed the parties that he would take the matter under advisement and inform them of his decision. In any case, the motion for new trial was overruled by operation of law. *See*

Tex.R. Civ. P. 329b; *Cecil v. Smith*, 804 S.W.2d 509, 511 (Tex.1991) ("[i]f an original or amended motion for new trial is not determined by written order signed within 75 days after the judgment was signed, it is overruled by operation of law").

of cattle at the Loma Alta ranch, and that Villanueva was worried about seventy-five head of cattle for purposes of collateral.[2] Vasquez testified he was called because the bank "could not locate any livestock they had put up as collateral." Villanueva told him he was looking for seventy-five head of cattle, and Martin did not have the cattle. However, Vasquez testified the bank never gave him any information that was false, they just failed to give him all the information.

If Villanueva believed the security interest to be seventy-five head of cattle, which the jury could have reasonably inferred from the evidence,[3] including Vasquez's testimony and report, Villanueva's statements that the bank was looking for seventy-five head of cattle and that it could not locate any of the cattle, which were made when the bank had already sold twenty head of cattle as collateral, were knowingly false. That is, there is some evidence the bank knew where some of the collateral was when Villanueva told Vasquez it could not locate any of the cattle. Moreover, if Villanueva believed the security interest was limited to seventy-five head of cattle, his statement that the bank was looking for seventy-five head was false considering the bank had already sold twenty head of cattle. Viewing the evidence in a light most favorable to the verdict, there is more than a scintilla of evidence that Villanueva made knowingly false representations to Vasquez that Martin did not have the cattle and that the bank could not locate any of the livestock that had been used as collateral. In fact, the bank had already located at least twenty and sold them to apply funds to the loan.

Appellants also urge that there is no evidence to show they lacked probable cause. In the context of malicious prosecution, probable cause is "the existence of such facts and circumstances as would excite belief in the mind of a reasonable person, acting on facts within his knowledge, that the person charged was guilty of the crime for which he was prosecuted." *Richey*, 952 S.W.2d at 517. The probable cause determination asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted. *Id.* at 523 (citations omitted).

Whether probable cause is a question of law or a mixed question of law and fact depends on whether the parties dispute the underlying facts. *Id.* When the facts underlying the defendant's decision to prosecute are disputed, the trier of fact must weigh evidence and resolve conflicts to determine if probable cause exists,

---

2. Appellants assert the parol evidence rule precludes this Court from considering extraneous documents and communications between Martin and the bank indicating that the collateral was seventy-five, rather than all of his cattle. However, in reviewing the sufficiency of the evidence of the jury's malicious prosecution finding, we are not limited to considering the terms of the note. Instead, we are concerned with the representations made to the law enforcement official, and whether those representations were knowingly false. *See Browning–Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 293 (Tex.1994).

3. Appellants dispute this inference because the notes unambiguously provided that the bank held a security interest in all of Martin's livestock, and the bank could have been looking for seventy-five head of cattle to cover the balance on the note, despite its recent sale of twenty cattle. In a no-evidence review, however, we make all inferences in favor of the verdict, disregarding all inferences to the contrary. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex. 1998).

as a mixed question of law and fact. *Id.;* *Villegas v. Griffin Indus.,* 975 S.W.2d 745, 752 (Tex.App.—Corpus Christi 1998, pet. denied).

■ We must determine whether there is more than a scintilla of evidence showing that the bank could not have reasonably believed Martin had committed the crime of hindering a secured creditor. A person commits the offense of hindering a secured creditor if he signs a security agreement creating a security interest in property and, "with intent to hinder enforcement of that interest or lien, he destroys, removes, conceals, encumbers, or otherwise harms or reduces the value of the property." TEX. PEN.CODE ANN. § 32.33 (Vernon 1994).

Appellants contend they had probable cause to make a report because it reasonably appeared that Martin committed the crime of hindering a secured creditor. Under the security agreement, Martin was required to obtain the bank's written consent to sell or transfer the collateral. According to the bank, its security interest extended to all of Martin's cattle. Martin sold fifty-eight cattle without giving notice to the bank or obtaining written consent; consequently, the bank maintains it had probable cause to make its report.

Martin counters that the bank waived any interest it had in the fifty-eight cattle by authorizing the sale, through its chairman of the board of directors, Gus Barrera. Martin testified that Barrera was not only present at the sale of the cattle, but participated in gathering and hauling the cattle to the buyer's pasture. Gus Martin testified that Martin used the money to renew the note and pay some of the principal.

■ A party holding a secured claim in collateral waives his security interest and may neither foreclose nor bring an action for conversion if he consents to a transfer of collateral. *Conoco, Inc. v. Amarillo Nat. Bank,* 950 S.W.2d 790, 795 (Tex. App.—Amarillo 1997, pet. denied). Thus, if the bank authorized the sale of the cattle, it waived its security interest in the fifty-eight cattle and could not have reasonably believed Martin committed the offense of hindering a secured creditor.

■ An "agent" is one who is authorized by a person or entity to transact business or manage some affair for that person or entity. *Neeley v. Intercity Mgmt. Corp.,* 732 S.W.2d 644, 646 (Tex. App.—Corpus Christi 1987, no writ); *Jorgensen v. Stuart Place Water Supply Corp.,* 676 S.W.2d 191, 194 (Tex.App.— Corpus Christi 1984, no writ). A director of a corporation is not, as such, an agent of the corporation. *See* RESTATEMENT (SECOND) OF AGENCY § 14C (1958). Nonetheless, an agency relationship may be found from underlying facts or direct and circumstantial evidence showing the relationship of the parties. *Elite Towing, Inc. v. LSI Fin. Group,* 985 S.W.2d 635, 643 (Tex. App.—Austin 1999, no pet.); *Stanford v. Dairy Queen Prods.,* 623 S.W.2d 797, 800– 801 (Tex.App.—Austin 1981, writ ref'd n.r.e.).

■ Absent actual or apparent authority, an agent may not bind a principal. *Suarez v. Jordan,* 35 S.W.3d 268, 272–73 (Tex.App.—Houston [14th Dist.] 2000, no pet.). Both actual and apparent authority are created through conduct of the principal directed either to the agent (actual authority) or to a third person (apparent authority). *Id.* at 273. For there to be an agency relationship, there must be some act constituting an appointment of a person as an agent; it is a consensual relationship. *Carr v. Hunt,* 651 S.W.2d 875, 879 (Tex.App.—Dallas 1983, writ ref'd n.r.e.). Consent may be implied rather than express. *Id.* Indeed, "[a]n agency

relationship does not depend upon express appointment or assent by the principal; rather, it may be implied from the conduct of parties under the circumstances." *Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex. 1992). An agency may be implied from acquiescence. *Wink v. Wink*, 169 S.W.2d 721, 723 (Tex.Civ.App.–Galveston 1943); *Gunn v. Schaeffer*, 567 S.W.2d 30, 32 (Tex. Civ.App.—El Paso 1978, no writ).

▆▆▆▆ Apparent authority is based upon the doctrine of estoppel, and one seeking to charge the principal through apparent authority of the agent must establish conduct by the principal which would lead a reasonable prudent person to believe the agent has the authority he purports to exercise. *Biggs v. United States Fire Ins. Co.*, 611 S.W.2d 624, 629 (Tex.1981); *Coker v. Cramer Fin. Group, Inc.*, 992 S.W.2d 586 (Tex.App.—Texarkana 1999, no pet.) Only the conduct of the principal, leading one to suppose that the agent has the authority he purports to exercise, may charge the principal through the apparent authority of an agent. *Southwest Title Ins. Co. v. Northland Bldg. Corp.*, 552 S.W.2d 425, 428 (Tex. 1977); *Suarez*, 35 S.W.3d at 273.

In this case, there was testimony from Martin that the bank had the board of directors approve major loans and that Barrera approved Martin's loan. When asked why he believed Barrera knew about his loan, Martin responded that "Barrera approved the loan, and I'm sure he told Markus Villanueva I had at least 220 head out there or he wouldn't have approved the loan." Martin further testified:

This is why [Villanueva] never had to go out really and inspect the cattle, because [Barrera] worked with us. We had all the ranches together, and we all knew more or less how many cattle we all had. And he was, I'm sure, consulted when they.... When the loan is made, it has to go before the board of directors, unless it's a real small loan, and they have to approve it.

We conclude Martin could have reasonably believed, from the bank's conduct, including its ostensible acquiescence to Barrera's involvement with Martin's loan, that Barrera was authorized by the bank to assist Martin in selling his cattle. Accordingly, Martin provided evidence that the bank waived its interest in the fifty-eight head of cattle; thus, there is some evidence that the bank could not have reasonably believed Martin committed the crime of hindering a secured creditor. Appellants' first and third issues are overruled.

In their second issue, appellants assert the trial court erred by submitting an improper question in the jury charge. According to appellants, the trial court's question, which allowed the jury to find liability for malicious prosecution if appellants failed to make a full and fair disclosure, presented an invalid legal theory to the jury. *See Lieck*, 881 S.W.2d at 293 (plaintiff may prove procurement by showing defendant provided false information which he knows is false). Appellee contends appellants waived any error by failing to object to the question as submitted to the jury and that the question was substantially correct.

Appellants requested the following question and instruction with respect to procurement:

Do you find that First Valley Bank procured the criminal prosecution of Sam Martin?

You are instructed that a person procures a criminal prosecution if his actions were enough to cause the prosecution and, but for his actions, the prosecution would not have occurred. A person does not procure a criminal

prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false. A criminal prosecution may be procured by more than one person. *Browning–Ferris Industries, Inc. v. Lieck,* 881 S.W.2d 288 (Tex. 1994).

Refused: ____

Modified as follows: ____

The trial court placed a check mark next to "modified as follows", placed brackets around the entire second paragraph, and signed the document. The charge actually submitted, unlike the one requested by appellants, permitted the jury to find they procured the prosecution if they failed to fully and fairly provide material information. However, appellants did not object to the charge on the ground that it allowed the jury to enter a verdict based on an invalid legal theory.

■ Rule 276 of the Texas Rules of Civil Procedure provides, in part:

When an instruction, question, or definition is requested and the provisions of the law have been complied with and the trial judge .... modifies the same the judge shall endorse thereon "Modified as follows: (stating in what particular the judge has modified the same) and given, and exception allowed" and sign the name officially. Such ... modified instruction, question, or definition, when so endorsed shall constitute a bill of exceptions, and it shall be conclusively presumed that the party asking the same presented it at the proper time, excepted to its ... modification, and that all the requirements of law have been observed, and such procedure shall entitle the party requesting the same to have the action of the trial judge there-on reviewed without preparing a formal bill of exceptions.

Tex.R. Civ. P. 276. We conclude the trial court's endorsement of the proposed jury question "modified as follows" constitutes a bill of exception, and we therefore conclusively presume, appellants preserved error. *See* Tex.R. Civ. P. 276. The court indicated with brackets the general language it was to modify. Though the court did not include the language "and given, and exception allowed" in its endorsement, we conclude the trial court's endorsement "modified as follows" adequately preserved error given the facts of this case.

We must next determine if the trial court erred in submitting a malicious prosecution question which allowed the jury to find procurement if the defendant failed to fully and fairly disclose all material information known to him.

In *Browning–Ferris Indus., Inc. v. Lieck,* 881 S.W.2d 288, 289 (Tex.1994), the supreme court considered whether a trial court erred in submitting an instruction that allowed the jury to find liability for malicious prosecution if the defendant caused, aided or cooperated in causing the criminal . prosecution to be commenced. *Id.* at 291. The court concluded that "the jury should be asked, not whether the defendant 'caused' criminal proceedings, but whether he either initiated or 'procured' them...." *Id.* at 293. The terms initiated and procured, taken from the Restatement (Second) of Torts, do "not subject a person to liability for merely aiding or cooperating in causing a criminal prosecution." *Id.* at 292. "Were it otherwise, persons only incidentally involved in a criminal investigation might find themselves facing allegations in a civil suit." *Id.* Accordingly, the supreme court found that the trial court's instruction, which allowed a finding of malicious prosecution

for mere assistance or cooperation, was improper.

In addition, the supreme court expressly stated that procurement should be defined such that "[a] person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false." *Id.*

The supreme court also addressed the issue of whether a trial court erred in refusing to instruct the jury that a defendant could not be liable for malicious prosecution unless he gave knowingly false information to investigators. *Id.* at 294. Because there are instances in which a defendant can be held liable for making statements to law enforcement officials which he did not actually know were false, the supreme court upheld the trial court's refusal to so instruct. *Id.* The evidence showed a defendant withheld information from law enforcement officials which might have been important in determining whether to prosecute the plaintiff. *Id.* at 290. As the court observed, comment g of section 623 of the Restatement indicates that where the prosecutor does not exercise his own discretion, "the provider of information has procured a criminal prosecution whether he knew the information to be false or not." *Id.* Accordingly, the supreme court held the trial court did not err in refusing to submit an instruction that the defendant could not be liable unless he knew the statements made were false because the instruction excluded the possibility of liability if the prosecutor did not exercise his own discretion and the defendant did not know his statements were false. *Id.* at 294.

On its face, the supreme court's definition of *procurement* would not appear to authorize a finding of liability based on a defendant's failure to fully and fairly disclose all material information known to him. However, a closer examination of section 653 of the Restatement, upon which the supreme court relied throughout *Lieck* and in crafting its definition of procurement, reveals that a defendant's failure to disclose material information may satisfy the procurement element of a malicious prosecution claim.

As the court noted, comment g of section 653 states that merely giving information or making an accusation of criminal misconduct does not amount to a procurement of the proceedings initiated by the officer if it is left entirely to his discretion whether to initiate the proceedings. *Id.* at 293. Instead, "in order to charge a private person with responsibility for the initiation of proceedings by a public official, it must ... appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false." *Id.* at 294 (citing RESTATEMENT (SECOND) OF TORTS § 653, cmt. g (1977)). Thus, when the decision whether to prosecute is left to the discretion of another, "a person may be liable, not only when he gives information he knows is false to a prosecutor, but also when his conduct is the determining factor in the prosecutor's decision to prosecute." *Lieck*, 881 S.W.2d at 294.

Considering *Lieck* and section 653 of the Restatement, we are not convinced that procurement, when the decision whether to prosecute is left to the discretion of another, can only occur if the person provides information which he knows is false. When a defendant provides information to a prosecutor regarding criminal misconduct, but fails to fully and fairly

disclose all material information, and his failure to disclose such information ultimately leads the prosecutor to initiate the prosecution, his conduct can be said to have been the determining factor in the prosecutor's decision to prosecute. Such conduct would satisfy the Restatement's requirements for procurement.

Recognition of liability for a defendant's failure to fully and fairly disclose all material information pertinent to criminal misconduct is not inconsistent with general tort principles, which allow for liability for nonfeasance under some circumstances. Generally, liability for "nonfeasance" requires "some definite relation between the parties, of such a character that social policy justifies the imposition of a duty to act." W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 56, at 374 (5th ed.1984). For example, a carrier may be required to aid a passenger in peril, and an innkeeper to aid his guest. *Id.* at 376. Moreover, if the defendant's own acts, whether tortious or innocent, are responsible for the plaintiff's situation, "a relation has arisen which imposes a duty to make a reasonable effort to give assistance, and avoid any further harm." *Id.* at 377. Section 321 of the Restatement (Second) of Torts recognizes a duty to act when prior conduct is found to be dangerous. That section provides, in part, "(i)f the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect." RESTATEMENT (SECOND) OF TORTS § 321 (1965).

Furthermore, in the context of a fraud action, Texas courts recognize a duty to speak under some circumstances. *See e.g., Hoggett v. Brown,* 971 S.W.2d 472, 487–88 (Tex.App.—Houston [14th Dist.] 1997, no writ); *State Nat'l Bank v. Farah Mfg. Co.,* 678 S.W.2d 661, 681 (Tex.App.— El Paso 1984, writ dism'd by agr.). For example, when one makes a partial disclosure and conveys a false impression, he has a duty to reveal the whole truth. *See Ralston Purina Co. v. McKendrick,* 850 S.W.2d 629, 636 (Tex.App.—San Antonio 1993, writ denied); *Intl. Sec. Life Ins. Co. v. Finck,* 475 S.W.2d 363, 370 (Tex.Civ. App.—Amarillo 1971), *rev'd on other grounds,* 496 S.W.2d 544 (Tex.1973).

Similarly, a defendant who takes the affirmative act of providing information to a law enforcement official regarding a third party's criminal misconduct, and knows of material information, which would likely affect the prosecutor's determination as to whether to prosecute, should have a duty to disclose all such information.

The trial court's submission of the malicious prosecution question, which defined procurement to include failure to disclose material information, was not erroneous.[4] Appellants' second issue is overruled.

**4.** Appellee directs this Court to *Richey v. Brookshire Grocery Co.,* 952 S.W.2d 515, 519 (Tex.1997), for the proposition that the failure to fully disclose all material information can support the causation element of a malicious prosecution case. We do not read *Richey,* however, as expressly allowing the failure to disclose all relevant facts to suffice for causation in a malicious prosecution action.

In *Richey,* the supreme court concluded that the defendant's failure to fully and fairly disclose all relevant facts to police was not relevant to the probable cause element. *Id.* The court addressed the malice and causation elements in dictum, stating, "failing to fully and fairly disclose all material information and knowingly providing false information to the prosecutor are relevant to the malice and causation elements of a malicious prosecution claim but have no bearing on probable cause." *Id.* The court further explained that "the extent of the disclosure to the prosecutor

In issues six through nine, appellants challenge the legal and factual sufficiency of the evidence for the jury's award of damages based on the finding of malicious prosecution. Appellants challenge the sufficiency of the evidence to support the findings of mental anguish damages, loss of reputation damages, loss of credit reputation damages, and loss of earning capacity damages.

■■■■■ By issue six, appellants challenge the mental anguish damages on the bases that there is legally and factually insufficient evidence of compensable mental anguish and legally and factually insufficient evidence to uphold the amount of the award, $500,000. To support an award of mental anguish damages, a plaintiff must either present "direct evidence of the nature, duration, and severity of their mental anguish, thus establishing a substantial disruption in the plaintiff's daily routine," or "evidence of 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'" *Latham v. Castillo*, 972 S.W.2d 66, 70 (Tex.1998) (citing *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995)). There must also be evidence that the amount of mental anguish damages awarded is fair and reasonable, and the appellate court must perform a "meaningful evidentiary review" of the amount found. *Saenz v. Fidelity Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex.1996). Intentional or malicious conduct may be a significant factor in determining whether mental anguish damages are proper. *See City of Tyler v. Likes*, 962 S.W.2d 489, 495–96 (Tex.1997).

■■■■ Martin testified after he was indicted, his friends, who knew he had been in law enforcement for years, made jokes about the sheriff finally getting caught. He tried to laugh, but it hurt and made him feel bad. He realized when he was charged with hindering a secured creditor that he could have gone to prison for fifteen to twenty years. During a period of eight months when he was under indictment he did not sleep very well and had no peace; he had never had such a difficult time sleeping before. On the inside he felt, "[n]ot real good." When asked if he would need help with it, Martin testified, "I'll deal with it." His arrest and indictment were covered on television and in the newspapers, and he felt everybody knew. He felt a stigma of being a felon when he dealt with people, and he always carries that inside him. He felt bad because the arrest, indictment, and news coverage traumatized his family and ruined his son's reputation. He was ashamed. Martin felt bad because he would probably never be able to work in law enforcement again because of the indictment. He also let his real estate license lapse and did not apply for a handgun license because he would have to reveal the indictment.

In *Parkway v. Woodruff*, 901 S.W.2d 434, 445 (Tex.1995), the supreme court held that a plaintiff who testified she was "hot" and that the flooding of her house

is not probative of lack of probable cause, but rather indicates whether the complainant may have acted with malice or may have, by knowingly providing false information, caused the prosecution." *Id.; see also Lonon v. Fiesta Mart, Inc.*, 999 S.W.2d 458, 461 (Tex.App.—Houston [14th Dist.] 1999, no pet.). A close reading of *Richey* indicates that failing to disclose material information is relevant to malice, while knowingly providing false information is relevant to causation. *See Richey*, 952 S.W.2d at 519 (citing *Sebastian v. Cheney*, 24 S.W. 970 (Tex.Civ.App.), *rev'd*, 86 Tex. 497, 25 S.W. 691 (1894); *Lieck*, 881 S.W.2d at 293–94) (citing *Sebastian* for the proposition that failing to make full disclosure is probative of malice, while citing *Lieck* for the proposition that knowingly making false disclosure is probative of causation).

was "upsetting" and "not pleasant" failed to show compensable mental anguish. Her statements revealed mere emotions, such as anger, frustration, or vexation. *Id.* In this case, by contrast, Martin felt hurt and ashamed. He felt everyone knew of his arrest and indictment and felt the stigma of being considered a felon. He had difficulty sleeping for eight months.

In *Gunn Infiniti, Inc. v. O'Byrne,* 996 S.W.2d 854, 860–61 (Tex.1999), the supreme court held that grief, disappointment, public humiliation, and embarrassment over problems with an automobile did not rise to the level of compensable mental anguish. There, the plaintiff made conclusory statements of his emotional state and many of his feelings were unrelated to his cause of action against the automobile dealership. *Id.* In the present case, Martin explained the source of his anguish—shame over having been arrested and indicted in the public eye and carrying the stigma of being an alleged felon for months. He explained he felt bad for the trauma to his family and for the damage to his son's reputation. He explained that during the time he was under indictment he had difficulty sleeping.

We conclude there is legally and factually sufficient direct evidence of the nature, duration, and severity of Martin's mental anguish, thus establishing a substantial disruption in his daily routine. *Latham,* 972 S.W.2d at 70.

Appellants note that Martin never testified he needed to seek counseling or medication as a result of his emotions, and that he failed to present any expert medical testimony. However, appellants fail to direct this Court to any authority that expert testimony must support an award of mental anguish, and we are unable to find any.

■ We next consider whether the amount of damages awarded was fair and reasonable. *Saenz,* 925 S.W.2d at 614. Damages for mental anguish are considered uniquely within the province of the fact finder because of the subjective nature of such injuries and the nature of the related testimony and evidence. *Wal–Mart Stores, Inc. v. Itz,* 21 S.W.3d 456, 480 (Tex.App.—Austin 2000, no pet.); *Southwestern Bell Tel. Co. v. Wilson,* 768 S.W.2d 755, 763 (Tex.App.—Corpus Christi 1988, writ denied).

Here, Martin suffered public humiliation, shame for himself and family, and spent months with difficulty sleeping. He knew he could spend a long time in prison if convicted. We conclude that the jury's award of $500,000 for mental anguish is fair and reasonable and not so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. Appellants' sixth issue is overruled.

■ In issue seven, appellants contest the award of loss of reputation damages, arguing there is legally and factually insufficient evidence that Martin's reputation was damaged or that the amount awarded, $2,000,000, was fair and reasonable. Martin was a former law enforcement officer, a father, and had run for sheriff of Cameron County. He testified he lost a lot of respect in Cameron County. Martin testified his name is very important to him. He feels that he carries the stigma of having been indicted for a felony, and that everybody is aware of the indictment. His case was covered by the local media. Whenever he fills out an application that asks if he has ever been arrested and charged with a felony, he must answer affirmatively. He testified he will probably never be able to work in law enforcement again due to his indictment. We find there is legally and factually sufficient evidence to support the award of loss of reputation damages and that the award of

$2,000,000 is fair and reasonable considering Martin's relation with the community and the stigma associated with having a felony indictment on his record. Appellants' seventh issue is overruled.

Appellants, in their eighth issue, challenge the loss of credit reputation damages on the grounds that there is no evidence that he ever applied for a loan. The supreme court has held that for loss of credit reputation, "a plaintiff does not suffer actual damage merely from the inability to obtain a loan. There must be a showing that such inability resulted in injury and proof of the amount of that injury." *St. Paul Surplus Lines v. Dal–Worth Tank Co.*, 974 S.W.2d 51, 53 (Tex.1998). In *Dal–Worth*, the plaintiff presented evidence of his credit before and after he filed bankruptcy, but there was no evidence that the plaintiff ever needed to use the credit or ever tried to do so. *Id.*

 In this case, Martin testified his credit was excellent with the bank prior to the indictment. He had obtained and paid off several loans in the amounts of $20,000 or $30,000. He could walk into any bank in Texas and get a $20,000 loan. He testified his credit was ruined after the indictment. He lost his credit cards and testified he will not be able to get a loan for a long time. A few days before his indictment was dismissed, Martin went to the bank to attempt to renegotiate the terms of the loan. They did not want to make a new loan. He wanted some paperwork or a contract, but they refused and told him to pay as he could. Martin failed to provide testimony as to the amount of the injury, or the amount for which he sought to obtain a new loan or to renew the existing loan. The jury, in response to question eight, answered that $50,000 would pay all sums owed to appellants by Martin. Correspondingly, the jury awarded Martin $50,000 for loss of credit reputa-

tion. We are unable to find any evidence supporting this amount. Accordingly, there is legally insufficient evidence to support the award for loss of credit reputation. Appellants' eighth issue is sustained.

By their ninth issue, appellants attack the loss of earning capacity damages on the basis that a plaintiff can only recover such damages if he suffered a physical impairment or injury that impaired his ability to earn a living. Appellants direct us to *Metro. Life Ins. Co. v. Haney*, 987 S.W.2d 236, 244–45 (Tex.App.—Houston [14th Dist.] 1999, pet. denied), in which our sister court reversed an award of damages for loss of earning capacity because the plaintiff did not present sufficient evidence to prove diminished earning power as a result of physical impairment. The court stated, "[a] survey of Texas cases addressing claims for loss of earning capacity reveals that a plaintiff may recover where he has shown a physical impairment affecting his ability to earn a living." *Id.* at 245 (citations omitted).

 The cases cited by *Haney* all involve negligence personal injury claims, and none purport to hold that damages for lost earning capacity may not be recovered for torts not involving personal injuries. *See Hanna v. Lott*, 888 S.W.2d 132, 139 (Tex.App.—Tyler 1994, no writ) (no recovery for loss of earning capacity in negligence action where damage to car caused lost earnings because of the "loss of use" rule); *Border Apparel–East, Inc. v. Guadian*, 868 S.W.2d 894, 898 (Tex.App.—El Paso 1993, no writ) (no recovery for lost earnings in a negligence case because insufficient evidence of future wage expectancies); *Tri–State Motor Transit Co. v. Nicar*, 765 S.W.2d 486, 492 (Tex.App.—Houston [14th Dist.] 1989, no writ) (upholding an award of lost earning capacity in a personal injury case); *Ceiling Fan*

*Warehouse, Inc. No. 3 v. Morgan*, 723 S.W.2d 195, 199 (Tex.App.—Houston [1st Dist.] 1986), *aff'd as modified*, 725 S.W.2d 715 (Tex.1987) (award of lost earning capacity damages in negligence case reversed because no evidence that injury was associated with inability to work); *Goldston Corp. v. Hernandez*, 714 S.W.2d 350, 352 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e) (upholding lost earning capacity damages in a personal injury case). We decline to hold that a plaintiff who does not suffer personal injury may not recover for loss of earning capacity. *See Peshak v. Greer*, 13 S.W.3d 421, (Tex.App.—Corpus Christi 2000, no pet.) (finding sufficient evidence to uphold damages for lost earning capacity in a libel suit); *Borden, Inc. v. Guerra*, 860 S.W.2d 515, 524–25 (Tex. App.—Corpus Christi 1993, writ dism'd by agr.) (upholding an award of future lost wages and employment benefits). Thus, a plaintiff may recover for loss of earning capacity if he has shown an injury affecting his ability to earn a living. Certainly, as may be the case with physical impairments, acts such as malicious prosecution and libel may have a devastating effect on an individual's ability to earn a living.

We must still determine whether Martin produced legally and factually sufficient evidence that his injury affected his ability to earn a living. Loss of earning capacity is always uncertain and generally left to the discretion of the fact finder. *Borden*, 860 S.W.2d at 524. At the same time, the injured party is required to introduce sufficient evidence to allow the jury to reasonably measure earning capacity prior to the injury. *Wal–Mart Stores, Inc. v. Cordova*, 856 S.W.2d 768, 770 (Tex.App.—El Paso 1993, writ denied); *City of Houston v. Howard*, 786 S.W.2d 391, 395–96 (Tex.App.—Houston [14th Dist.] 1990, writ denied).

In the present case, Martin testified he quit his job in Colorado because of the indictment. He earned $2,000 a month in that job, and was given a place to reside, a truck, and all of his expenses were paid. He testified this job would be available when he returned if his employers did not hire someone else. Martin testified that he did not believe he could get a job in law enforcement due to the indictment. He made approximately $40,000 a year while he was in law enforcement. Martin was fifty-six years of age at the time of trial. The jury awarded Martin $360,000 for lost earning capacity. We conclude he produced legally and factually sufficient evidence to support this award. Appellants' ninth issue is overruled.

By their fourth, fifth, and tenth issues, appellants contend there is legally and factually insufficient evidence to support the jury's finding of fraud. Appellants first maintain there was no evidence or factually insufficient evidence that Villanueva made a false statement or promise without an intention of performing. Appellants further assert there is no evidence or factually insufficient evidence that Martin was damaged from any representations.

The elements of fraud are: (1) a material misrepresentation was made; (2) it was false; (3) when the representation was made, the speaker knew it was false or the statement was recklessly asserted without any knowledge of its truth; (4) the speaker made the false representation with the intent that it be acted on by the other party; (5) the other party acted in reliance on the misrepresentation; and (6) the party suffered injury as a result. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex.1990). A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made. *Formosa Plastics Corp.*

*USA v. Presidio Engrs. and Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998).

■ As evidence of a false representation, Martin directs this Court to representations made by Villanueva to Gus Martin when he went to the bank to make an interest payment for his father in October of 1996. Gus Martin testified that he informed Villanueva that his father would return around the first of the year to renew the note. In response, Villanueva told him he was going to accelerate the note. However, Gus Martin was told that when his father came in to renew the note at the first of the year, the interest rate would be retroactive upon renewal.

Gus Martin relayed to his father what Villanueva had told him regarding the note. Martin returned during the Christmas holidays to renew the note and visit his family. He deposited $1,451.41 in his checking account at the bank. According to Martin, he was going to use this money to renegotiate the loan. When he later went to withdraw funds from the account, he learned that the money had been seized. Martin then spoke with Villanueva, who told him that his note had been accelerated and that they were going to foreclose. Villanueva said the money was taken out of the account to pay interest on the loan. Martin told him, "if you do not put this money back into my checking account and renegotiate this loan, I'm going to leave the bank. . . ." Martin then left and returned to Colorado.

■ In his brief, Martin contends that Villanueva's statement that he could renew the note when he returned was false and that he had no intention of performing when he made the representation. We are unable, however, to find any evidence that

Villanueva's representation that Martin could renew the note when he returned was false because there is no evidence the bank refused to renew the note. Martin's statement that he was going to leave the bank if Villanueva did not return the money to his checking account and renegotiate the loan does not necessarily lead to the inference that the bank refused to renew the loan. In fact, it is equally plausible that Villanueva said nothing to Martin and Martin left the bank, or that Villanueva told Martin he would renew the note but not return the money to his checking account. "When circumstances are consistent with either of the two facts and nothing shows that one is more probable than the other, neither fact can be inferred." *Litton Indus. Prods., Inc. v. Gammage,* 668 S.W.2d 319, 324 (Tex.1984). Because there is no evidence the bank refused to renew the loan, there is legally insufficient evidence to support the jury's finding that appellants committed fraud. Appellants' fourth, fifth, and tenth issues are sustained.

In their eleventh issue, appellants contest the legal and factual sufficiency of the evidence that they acted with malice, a prerequisite for the award of exemplary damages, which in this case was $15,000,000.[5] To establish malice as a basis for an award of exemplary damages, Martin must have proven by clear and convincing evidence:

(A) a specific intent by the defendant to cause substantial injury to the claimant; or

(B) an act or omission:

(i) which when viewed objectively from the standpoint of the actor at the time of the occurrence involves an extreme de-

**5.** We note that appellants do not contend in issue eleven that the award of exemplary

damages was excessive.

gree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7) (Vernon 1997).

When reviewing a fact finding made by clear and convincing evidence, we must determine, after considering all of the evidence, whether the trier of fact could reasonably conclude that the existence of the fact is highly probable. *In re G.B.R.*, 953 S.W.2d 391, 396 (Tex.App.—El Paso, 1997, no writ); *Ybarra v. Tex. Dept. of Human Servs.*, 869 S.W.2d 574, 579–80 (Tex.App.—Corpus Christi 1993, no writ). We will sustain a challenge to the sufficiency of the evidence under this standard "if the fact finder could not have reasonably found that the fact was established by clear and convincing evidence." *Ybarra*, 869 S.W.2d at 580; W. Wendell Hall, *Standards of Review*, 29 ST. MARY'S L.J. 351, 502–03 (1998). Thus, we will reverse the award of exemplary damages if the jury could not have reasonably concluded that it was highly probable that appellants acted with malice.

We have already concluded there is some evidence that the bank provided knowingly false information to Vasquez by telling him that they were looking for seventy-five head of cattle, and that they were unable to locate Martin's cattle. We further conclude the jury could have reasonably found that appellants acted with malice by clear and convincing evidence. Providing information which is likely to lead to the criminal prosecution of an individual, when one knows the information to be false, involves an extreme

risk of harm to that individual. Appellants' eleventh issue is overruled.

By their twelfth issue, appellants contend the trial court erred in failing to apply a statutory cap to the exemplary damages awarded by the jury. TEX. CIV. PRAC. & REM.CODE ANN. § 41.008 (Vernon 1997).

Martin asserts that the cap is inapplicable because the award falls under the Texas Debt Collection Act, and at the time Martin's cause of action accrued, chapter 41 of the civil practice and remedies code did not apply to actions under the Act. *See* Act of May 19, 1973, 63rd Leg., R.S., ch. 547, § 2, 1973 Tex. Gen. Laws 1513. Appellants respond that Martin did not submit a question to the jury for liability under the Texas Debt Collection Act (the Act). Accordingly, appellants maintain Martin waived any such question; and because there was no claim under the Act, the cap is applicable.

The plaintiff has the "burden to obtain affirmative answers to jury questions as to the necessary elements of his cause of action." *Ramos v. Frito–Lay, Inc.*, 784 S.W.2d 667, 668 (Tex.1990). The failure to submit a question to a jury on a theory of liability waives any such claim. *See Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex.1991).

Martin contends that by finding appellants liable for fraud and malicious prosecution, the jury made the necessary findings to support a claim under the Act. We disagree. The Act, which has been codified in the finance code, provided that "[n]o debt collector may collect or attempt to collect any debt alleged to be due and owing by any threats, coercion, or attempts to coerce which employ any of the following practices: * * * * (b) accusing falsely or threatening to accuse falsely any person of fraud or any other crime." Act of

May 19, 1973, 63rd Leg., R.S., ch. 547, § 2, 1973 Tex. Gen. Laws 1513. In this case, no question was presented to the jury as to whether appellants collected or attempted to collect any debt by threat, coercion, or attempts to coerce.[6] Because the jury was not presented with a theory of liability under the Act, Martin has waived the claim and cannot claim now that this case is governed by the Act. Accordingly, the Act does not preclude application of the exemplary damages cap found in section 41.008 of the civil practice and remedies code. We conclude the trial court erred in failing to apply section 41.008 of the civil practice and remedies code to the award of exemplary damages.

Section 41.008 of the Texas Civil Practice and Remedies Code limits exemplary damages to the greater of $200,000 or two times the amount of economic damages plus noneconomic damages not to exceed $750,000. TEX. CIV. PRAC. & REM.CODE ANN. § 41.008 (Vernon 1997). In the present case, after eliminating the fraud damages and loss of credit reputation damages which we have reversed based on legally insufficient evidence, we are left with $500,000 in mental anguish damages, $2,000,000 for damages to reputation, and $360,000 for loss of earning capacity. The award of $360,000 for loss of earning capacity is an economic damage; that is, it is a compensatory damage for pecuniary loss. See TEX. CIV. PRAC. & REM.CODE ANN. § 41.008 (Vernon 1997). Thus, two times the economic damages in this case is $720,000. The amount of noneconomic damages is $2,500,000. Section 41.008 per-mits an award of two times economic damages plus an amount equal to any noneconomic damages, not to exceed $750,000. Therefore, Martin was entitled to no more than $720,000 plus $750,000, or $1,470,000 in exemplary damages. Appellants' twelfth issue is sustained and the award of exemplary damages is reduced accordingly.

With respect to Martin's claim of fraud, the judgment of the trial court is REVERSED and RENDERED that Martin take nothing. Likewise, the award of damages in favor of Martin for loss of credit reputation is REVERSED and RENDERED that Martin take nothing. The award of exemplary damages is MODIFIED to reflect an award of $1,470,000. In all other respects, the judgment is AFFIRMED.

---

6. We note that the court, in its conclusions of law, concluded that Martin committed various violations of the Act. It is generally improper for a trial court to make findings of fact and conclusions of law following a jury trial. See TEX.R. CIV. P. 296; *John G. and Stella Kenedy Mem. Found. v. Dewhurst*, 994 S.W.2d 285, 308 (Tex.App.—Austin 1999, no pet); *Rathmell v. Morrison*, 732 S.W.2d 6, 16 (Tex.App.—Houston [14th Dist.] 1987, no writ). Here, the jury made no findings with respect to the Act and the court did not act as the fact-finder in this case. Whether appellants committed a violation of the Act in this case was a question of fact, and thus, properly left to the jury.