IN THE SUPREME COURT OF TEXAS









IN THE SUPREME COURT OF TEXAS

 

════════════

No. 01-0910

════════════

 

First Valley Bank of Los
Fresnos, Norwest Bank of Texas, N.A., 

and Wells Fargo Bank (Texas),
N.A., Petitioners

 

v.

 

Sam Martin, Respondent

 

════════════════════════════════════════════════════

On Petition for Review from the

Court of Appeals for the Thirteenth District
of Texas

════════════════════════════════════════════════════

 

 

Argued
January 28, 2004

 

 

Justice Brister delivered
the opinion of the Court, in which Chief
Justice Phillips, Justice Hecht, Justice Owen, Justice O=Neill, Justice Jefferson, Justice Smith, and Justice Wainwright joined.

 

Justice Wainwright
filed a concurring opinion.

 

Justice Schneider did
not participate in the decision.

 

 

A debtor violates the Texas Penal Code if he
removes, conceals, or sells secured property with intent to appropriate it.[1]  In this case, a jury found that Sam Martin
owed $50,000 to First Valley Bank of Los Fresnos, and
he admits he sold a substantial part of the collateral and kept the money for
himself.  

Yet Martin claims the Bank maliciously prosecuted
him by complaining to the authorities, who indicted him but later dismissed the
charges.  A Cameron County judge and jury
agreed, awarding Martin more than $18 million. 
The court of appeals affirmed, but reduced the damages award to $4.33
million.[2]


As a matter of law, we find no evidence that the
Bank procured the charge on which Martin was indicted.  While the Bank might have handled its
collection efforts differently, there was no evidence it exceeded the parties= loan agreements.  No credit system in the world can last long
if creditors are punished for lawfully demanding their money back.  Accordingly, we reverse.[3]

In March 1996, Sam Martin renewed his loan at the
Bank for the ninth time, agreeing to pay principal of $30,323.15 plus interest,
and pledging all his livestock as security. 
Thereafter, Martin took a ranching job in Colorado, where (as he
admitted at trial), AI
had an address up there, but it was a ranch house out in the middle of a ranch
of about 16,000 acres up in the mountains.@  When the loan came due in September 1996 and
the Bank demanded payment, Martin told his son to Atell
them I will be there during the Christmas holidays and renegotiate the loan
with them.@  

Unwilling to wait, the Bank accelerated the note
without notice, as the security agreement provided it could do.  When Martin returned to the area and
deposited a $1,500 check in his account, the Bank offset it against his
outstanding loan, again as the loan documents provided it could do.  

Irate at the Bank=s
actions, Martin informed a bank officer AI=m going to leave the bank and you will
not hear from me again until that money is put back into my account.@ 
True to his word, from that time forward Martin refused to speak with
anyone at the Bank, or to pay anything to the Bank.

But he did hire an attorney in New Mexico to Aadvise the Bank where their cattle was.@ 
The attorney sent a letter to the Bank identifying three ranches where
75 head were located.  But the ranches
were huge and the cattle wild, so only twenty could be rounded up.  The Bank sold these for $200 a head and
credited Martin=s note.[4]

Unable to contact Martin or locate the other
cattle, the Bank complained to the authorities B
which it had every right to do.  A deputy
sheriff investigated, and could not locate Martin or the cattle either.  He testified that the three ranches Martin
identified covered more than 250 square miles of rough country and contained
skittish cattle belonging to many owners, so those belonging to a particular owner
could not be identified except by scouring the whole area and corralling them
all.  The deputy testified that the Bank
never told him that twenty cattle had been found, sold, and credited to Martin=s account. 

The deputy presented the results of his
investigation to the district attorney=s
office.  Although his report and the Bank
officer=s
supporting affidavit focused solely on the collateral cattle that could not be
found, Martin was indicted for selling or disposing of secured property in
violation of the following penal statute:

 

A person who is a debtor under a
security agreement, and who does not have a right to sell or dispose of the
secured property or is required to account to the secured party for the
proceeds of a permitted sale or disposition, commits an offense if the person
sells or otherwise disposes of the secured property, or does not account to the
secured party for the proceeds of a sale or other disposition as required, with
intent to appropriate (as defined in Chapter 31) the proceeds or value of the
secured property.  A person is presumed
to have intended to appropriate proceeds if the person does not deliver the
proceeds to the secured party or account to the secured party for the proceeds
before the 11th day after the day that the secured party makes a lawful demand
for the proceeds or account.[5]

 

When Martin returned to the area
in March 1998, he was arrested and released on bond.  The charges were dropped a few months later.[6]

Taking each element of the
statute in turn, Martin admitted at trial that he:

 

C          is a debtor on an overdue note,[7]
and (in his own words) AI
will not pay that note@;

 

C          signed a security agreement requiring prior notice to the
Bank before selling calves, and written consent from the Bank before selling
other cattle; 

 

C          sold 58 head of cattle in January 1995 without the Bank=s written consent; and 

 

C          kept most of the proceeds.[8]

 

These admissions establish all
the objective elements of the crime. 
When the objective elements of a crime reasonably appear to have been
completed, a private citizen has no duty to inquire whether the suspect has some
alibi or explanation before filing charges.[9]  Accordingly, as a matter of law Martin cannot
establish the absence of probable cause, as he must do to prove malicious
prosecution.[10]

The court of appeals found to the
contrary for three reasons.  First, the
court of appeals found the evidence of malicious prosecution legally sufficient
because the Bank reported it could not find any of Martin=s cattle, when in fact it had found and
sold twenty.[11]  But this statement was immaterial to the
indictment that ultimately issued B
Martin was indicted for the cattle he sold, not for cattle the Bank found
and sold.  A[A]
person who knowingly provides false information to the grand jury or a law
enforcement official who has the discretion to decide whether to prosecute a
criminal violation cannot be said to have caused the prosecution if the
information was immaterial to the decision to prosecute.@[12]  There was no evidence the Bank made any false
statement about Martin=s
sale, the only crime for which he was indicted. 
Because the prosecution was only for the cattle Martin sold, any false
statements regarding other cattle were immaterial to it.

Second, the court of appeals
found the Bank could be liable for failing to disclose material facts, even if
it made no false statements.[13]  We have expressly held that fair disclosure
is relevant to malice and causation, Abut
ha[s] no bearing on probable cause.@[14]  Once a citizen has probable cause to report a
crime, there can be no malicious prosecution, even if the subsequent report
fails to fully disclose all relevant facts.[15]  As Martin admitted the objective elements of
the crime, he could not prove the Bank lacked probable cause by pointing to
omissions from its report.

Finally, the court of appeals
held the Bank waived its lien on the 58 cattle Martin sold because a director
of the Bank helped move them for the sale. 
While recognizing that a director is usually not an agent of a
corporation,[16]
the court of appeals nevertheless held the director had apparent authority
because of the Bank=s Aostensible acquiescence to [the
director=s]
involvement with Martin=s
loan.@[17]

This is wrong on several
levels.  First, apparent authority must
be based on the acts of the principal.[18]  There was no proof that the bank authorized
this director to do anything on Martin=s
loan; the only proof offered was Martin=s
testimony that Ahe was, I=m sure, consulted when they. . . .  When the loan is made, it has to go before
the board of directors, unless it=s
a real small loan, and they have to approve it.@  Aside from the fact that this is pure
speculation, it asserts no act by the Bank that clothed the individual
directors with apparent authority to act on their own toward outsiders.  When a corporation=s
directors vote at a meeting, that does not authorize them to act unilaterally
on the corporation=s behalf;
indeed, the former is precisely the opposite of the latter.

Second, apparent authority is
limited to the scope of responsibility that is apparently authorized.[19]  Requiring bank directors to approve a loan on
a record vote does not authorize them to orally release the collateral or
forgive the debt.  If apparent authority
could do that, in many cases it would be an apparent violation of federal law.[20]

Third, there is no evidence the
director ever waived any of the Bank=s
rights expressly; Martin asserts only an implied waiver.  Waiver may be implied only if the surrounding
facts clearly demonstrate it; there can be no waiver if the actor says and does
nothing inconsistent with its rights.[21]  Bankers have every reason to help a debtor
sell collateral at a good price, as long as the bank gets paid.  Even if the actions alleged here were
authorized by the Bank, they might imply approval of the sale, but give no
indication whatsoever that the Bank did not care what happened to the money.  As a matter of law, there is no indication in
the director=s actions
of an intent to waive the Bank=s
security interest in the proceeds of Martin=s
sale.[22]


Martin asserts there was no
probable cause to believe his sale of the 58 head of cattle violated the Penal
Code for a reason besides the alleged waiver. 
He maintained throughout the trial that he pledged only 75 head of
cattle, and could not have intended to impair the Bank=s
collateral as he had more than 100 cattle somewhere in south Texas after the
sale.  But every security agreement he
signed (there were nine in all) stated that all his cattle were pledged
as collateral:

 

The collateral shall consist of
all the following described property and Owner=s
rights, title and interest in such property whether now owned or hereafter
acquired by Owner and wheresoever located:

 

*        *       
*

 

ALL LIVESTOCK NOW OWNED OR
HEREAFTER ACQUIRED BY DEBTOR, WHEREVER LOCATED INCLUDING BUT NOT LIMITED TO
SEVENTY-FIVE (75) HEAD OF CROSSBREED CATTLE. 
(Emphasis in original). 

 

Martin admitted he knew this is what the loan
documents said.[23]

Martin claimed there was an oral
agreement the loan would be secured by only 75 head of cattle, pointing for
support to a notice of the security interest and a pre-loan appraisal.  It is elementary that none of these could
alter or amend the Bank=s
security agreement.  No pre-loan
discussions or appraisal could survive the security agreements the parties
actually signed.[24]  Nor could the notice to third parties amend
the loan documents between the first two.[25]  If security documents in Texas mean what they
say (and no credit system can survive if they do not), as a matter of law
Martin pledged all his livestock.

To sum up, nothing the Bank
reported or failed to report caused the indictment relating to Martin=s cattle sale.  The documents Martin signed required him to
pay the loan when it came due, and assemble the cattle at the Bank=s request if he did not;[26]
he makes no apology for failing to do either. 
As a matter of law, Martin owes the Bank, not the other way around.

For the forgoing reasons, we
reverse the court of appeals=
judgment, and remand to the trial court for entry of judgment in favor of the
Bank in accordance with the jury=s
finding regarding Martin=s
debt to the Bank.[27]

 

______________________________________

Scott Brister

Justice

 

 

 

OPINION DELIVERED: 
September 3, 2004











[1]  Tex. Pen. Code ' 32.33.





[2] 55 S.W.3d 172, 194.





[3] Because there was no evidence of either a false
statement or a failure to disclose information that was material to Martin=s sale B the
only indicted offense B we need not decide whether the Bank preserved error,
if any, regarding the Court=s charge allowing liability on either ground.





[4] The cattle were sold to a brother of a bank director
at a price Martin claims was half of what they were worth.  But any claim that the Bank=s sale was not commercially reasonable, see Tex. Bus. & Com. Code _ 9.610
(formerly ' 9.504), was resolved against Martin by the jury=s finding that he owed the Bank the full $50,000 it
claimed, a finding he does not challenge on appeal.





[5] Tex. Pen. Code
' 32.33(e). 
Although the indictment alleged Martin sold or disposed of cattle in
January of 1997, neither party nor the investigating officer knew of any such
sale.  All agreed that Martin sold 58
head of cattle in January of 1995.





[6] A news article (admitted at trial over the Bank=s objection) quotes prosecutors as saying they Adropped the charge only because of a technical flaw in
the written indictment, but plan to reindict Martin
on the same charge soon.@  Martin argues
the charge was dropped when information was provided indicating his cattle were
somewhere in the area.  In any event, the
charge was never refiled.





[7] Q:         [By
defense counsel] And you admit, do you not, that that note is now long past
due, by almost two years?

     A:       [By
Martin] Yes, Sir, I do.





[8] While Martin=s son
testified that his father Arenewed his note and paid some principal@ with the proceeds, Martin admitted receiving more
than $13,000 from the sale and paid less than $3,000 to the Bank during the
period.





[9] Richey v. Brookshire Grocery Co., 952 S.W.2d
515, 518 (Tex. 1997).





[10] Id. at 517.





[11] 55 S.W.3d 172, 182.





[12] King v. Graham, 126 S.W.3d 75, 78 (Tex. 2003)
(per curiam).





[13] 55 S.W.3d at 186-87.





[14] Richey, 952 S.W.2d at 519.





[15] Id.





[16] 55 S.W.3d at 183 (citing RESTATEMENT (SECOND) OF
AGENCY ' 14C (1958)).





[17] Id. at 184.





[18] Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667,
672 (Tex. 1998) (holding authority to collect and transmit applications and
bonding fees insufficient to bestow apparent authority to provide investment
counseling services).





[19] See id. at 673-74.





[20] See D'Oench,
Duhme & Co. v. Fed. Deposit Ins. Corp., 315
U.S. 447, 458 (1942) (holding that debtor cannot assert against bank or
receiver defense based on secret agreement not appearing in bank=s records).





[21] Jernigan v. Langley, 111 S.W.3d 153, 156 (Tex.
2003) (per curiam). 
For the same reason, no renewal of the loan on the same terms after
Martin=s sale waived any claim to the proceeds he kept.





[22] See Tex.
Bus. & Com. Code ' 9.315(a).





[23] Q:        [By
defense counsel] The security agreement, does it not, says all livestock now
owned or hereafter acquired?

       A:     [By
Martin] Yes, sir.  That=s standard language on a note for cattle.

      Q:     Did
you understand that to be the language at the time you signed the security
agreement?

       A:     I certainly did, sir.





[24] See Tex.
Bus. & Com. Code ' 26.02; see also Barker v. Coastal Builders,
271 S.W.2d 798, 803 (Tex. 1954) (noting general rule that prior oral agreements
are merged in later written instruments); Jones v. Risley,
32 S.W. 1027, 1029 (Tex. 1895) (same).  





[25] See Crow‑Southland Joint Venture No.
1 v. N. Fort Worth Bank, 838 S.W.2d 720, 723-24 (Tex. App.CDallas 1992, writ denied) (noting security agreement
defines collateral to enable debtor and other interested persons to identify property
that creditor may claim as security, while financing statement merely notifies
third parties that the debtor=s property is or may be encumbered); Villa v.
Alvarado State Bank, 611 S.W.2d 483, 486-87 (Tex. Civ.
App.CWaco 1981, no writ) (same); see also Marine
Drilling Co. v. Hobbs Trailers, 697 S.W.2d 831, 833 (Tex. App.CCorpus Christi 1985, writ ref=d n.r.e.) (holding financing
statement description need not be so specific that the property may be
identified by it alone). 





[26] See Tex.
Bus. & Com. Code ' 9.609(c) (formerly ' 9.503)
(providing secured party may require debtor to assemble collateral and make it
available at a designated place). 





[27] Although some of Martin=s
witnesses suspected the Bank of stealing or otherwise obtaining some of the
missing cattle, the jury=s finding that Martin owed the entire $50,000
outstanding shows they did not credit those claims.